IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

SHANNON JEAN PRICE,

    Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,[1]

    Defendant.

No. C12-0092

REPORT AND RECOMMENDATION

TABLE OF CONTENTS

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.  PRIOR PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. PRINCIPLES OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.  FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    A.   Education and Employment Background . . . . . . . . . . . . . . . . . . . . . 5
    B.   Administrative Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        1.   Price's Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        2.   Vocational Expert's Testimony . . . . . . . . . . . . . . . . . . . . . 6
        3.   Price's Medical History . . . . . . . . . . . . . . . . . . . . . . . . 7

V.   CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    A.   ALJ's Disability Determination . . . . . . . . . . . . . . . . . . . . . . . 10
    B.   Objection Raised By Claimant . . . . . . . . . . . . . . . . . . . . . . . . 12

---

[1] Plaintiff originally filed this case against Michael J. Astrue, the Commissioner of Social Security Administration ("SSA"). On February 14, 2013, Carolyn W. Colvin became Commissioner of the SSA. The Court, therefore, substitutes Commissioner Colvin as the Defendant in this action. FED. R. CIV. P. 25(d)(1).

*VI.   CONCLUSION* .................................. 17

*VII.  RECOMMENDATION* .............................. 18

## *I. INTRODUCTION*

This matter comes before the Court on the Pro Se Complaint (docket number 3) filed by Plaintiff Shannon Jean Price on September 18, 2012, requesting judicial review of the Social Security Commissioner's decision to deny her application for Title XVI supplemental security income ("SSI") benefits. Price asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide SSI benefits.

## *II. PRIOR PROCEEDINGS*

Price applied for SSI benefits on July 30, 2009. In her application, Price alleged an inability to work since May 3, 1999 due to bipolar disorder, depression, and anxiety. Price's application was denied on September 30, 2009. On January 14, 2010, her application was denied on reconsideration. On February 1, 2010, Price requested an administrative hearing before an Administrative Law Judge ("ALJ"). On June 14, 2011, Price appeared via video conference before ALJ Jo Ann L. Draper for an administrative hearing.[2] Price and vocational expert Julie A. Svec testified at the hearing. In a decision dated July 13, 2011, the ALJ denied Price's claim. The ALJ determined that Price was not disabled and not entitled to SSI benefits because she was functionally capable of performing work that exists in significant numbers in the national economy. Price appealed the ALJ's decision. On July 18, 2012, the Appeals Council denied Price's

---

[2] Although informed of her right to representation by an attorney, Price chose to appear without representation at the administrative hearing. *See* Administrative Record at 8; 25-26.

request for review. Consequently, the ALJ's July 13, 2011 decision was adopted as the Commissioner's final decision.

On September 18, 2012, Price filed this action for judicial review. The Commissioner filed an Answer on January 11, 2013. On March 6, 2013, Price filed a brief indicating that there is not substantial evidence in the record to support the ALJ's finding that she is not disabled and that she is functionally capable of performing work that exists in significant numbers in the national economy. On May 15, 2013, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On July 25, 2013, Chief Judge Linda R. Reade referred this matter to a magistrate judge for issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

### III. PRINCIPLES OF REVIEW

Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id.* (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*, 674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

3

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence

would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Education and Employment Background

Price was born in 1975. She attended school through the eighth grade, and never earned a GED. Price told the ALJ that while in school, she was enrolled in special education classes because she had difficulty reading and writing. She stated that reading and writing continue to be difficult for her.

At the hearing, Price testified that she had worked at a couple of restaurants in the past, but only held those jobs for two to three weeks. She stated the "longest I've probably ever had a job was a couple of weeks."[3] In response, the ALJ inquired:

> Q: Okay. Why do you only work some place two or three weeks?
> A: My disorders. I don't know what it is. I've tried to work and tried to keep jobs, and I'm just not able to.
> Q: Well, what do you mean when you say your disorders? What is it specifically that keeps you from being able to work?
> A: The hallucinations -- my bipolar, for one. And then me being depressed, I think people are talking about me. And I don't know if they really are, but I take it in the wrong -- in the wrong way is what I do.

---

[3] Administrative Record at 36.

5

(Administrative Record at 36.) According to Price's employment records, she held various jobs between 1996 and 2001, but never earned more than $715 in a given year. She has no earnings since 2002.

### B. *Administrative Hearing*

#### 1. *Price's Testimony*

At the administrative hearing, the ALJ asked Price what kept her from maintaining a full time job:

> Q: Okay. Okay. Now, tell me what it is about your mental disorders that keeps you from being able to work.
>
> A: I -- A, I'm hyperactive. I have -- you know, I've been hyper ever since I've been a little kid, but it's not just that. It's -- I don't get along with -- I don't know what it is. It's, like -- not anxiety; it's a hallucination or -- the bipolar, you know, don't help any. I try to get -- to keep jobs and to get along with others. I just feel that they're saying something smart to me or they might say something to me, and I take it in a wrong way, because I'm -- one day I'll be very hyper, and the next I'll be so depressed[.]

(Administrative Record at 37-38.) Price also testified that she has difficulty getting along with others because she thinks people say bad things about her.[4]

#### 2. *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Julie Svec with the following hypothetical:

> [W]hile this individual has no exertional limitations, this individual wold be limited to task[s] that could be learned in 30 days or less, involving no more than simple work-related decisions with few workplace changes. This individual should

---

[4] *See* Administrative Record at 40.

6

> have no more than occasional interaction with public, coworkers, and supervisors. There should be no requirement to read instructions or write reports. And there should be no work at a production rate pace.

(Administrative Record at 43.) The vocational expert testified that under such limitations, Price could perform the following work: (1) cleaner (2,000 positions in Iowa and 200,000 positions in the nation), (2) poultry laborer (700 positions in Iowa and 38,000 positions in the nation), and (3) laundry worker (2,000 positions in Iowa and 140,000 positions in the nation). The ALJ provided the vocational expert with an additional hypothetical which was identical to the first hypothetical except that the individual's "concentration and ability to focus their attention was for periods less than two hours at a time" and the individual would be "absent from work three or more times a month[.]"[5] The vocational expert testified that with such additional limitations, Price would be precluded from competitive employment.

### 3. *Price's Medical History*

On September 9, 2009, Price met with Dr. Larry L. Richards, D.O., at the Abbe Center for Community Mental Health in Cedar Rapids, Iowa. Price presented with concerns about Attention Deficit Hyperactivity Disorder ("ADHD") and irritability. In discussing her background, Price stated that she had been in prison 5 times, and last got out of prison in September 2008. According to Price, she has "difficulty being around people so this compromised being able to work."[6] Dr. Richards summarized the state of Price's mental health as follows:

> [Price] feels that she has been down and depressed continuously. She states she always feels depressed. She

---

[5] Administrative Record at 44.

[6] Administrative Record at 315.

7

> doesn't want to get up in the morning. The depression seems to come out of nowhere. Sleep is poor. . . . Energy is somewhat variable. Concentration is very poor. Interest and enjoyment is not good. . . . [Price] did fulfill criteria for Generalized Anxiety Disorder. She also states she's had mood swings -- not super happy but irritable 8 times a day. It may last all day long. . . . She has anger that goes into a rage. This may happen several times a week. She has racing thoughts. . . . [Price] also fulfill[s] criteria for Attention Deficit Hyperactivity Disorder, combined type. She also has obsessive-compulsive traits. Washing her hands constantly. . . .

(Administrative Record at 315.) Upon examination, Dr. Richards diagnosed Price with ADHD, history of bipolar disorder, major depressive disorder, generalized anxiety disorder, obsessive-compulsive traits, angry episodes, and hallucinations.[7] Dr. Richards prescribed medication as treatment.

On September 30, 2009, Dr. Sandra Davis, Ph.D., reviewed Price's medical records and provided Disability Determination Services ("DDS") with a Psychiatric Review Technique and mental residual functional capacity ("RFC") assessment for Price. On the Psychiatric Review Technique assessment, Dr. Davis diagnosed Price with ADHD, history of bipolar disorder, and generalized anxiety disorder. Dr. Davis determined that Price had the following limitations: moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Davis determined that Price was moderately limited in her ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and

---

[7] It appears from her medical records that Price's diagnosis of hallucinations refers to the fact that she sometimes "hears" people talking to her when they are not talking to her, and also believes at other times that people are talking about her when they are not. *See* Administrative Record at 316.

8

concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. Dr. Davis concluded that:

> [Price] should be able to understand, remember, and carry out simple instructions when so motivated. She would do best in an environment where significant amounts of interpersonal contact are not required. She would need preparation for rapid or complex change. Attention and concentration are poor, however she recently started some medication to assist this.

(Administrative Record at 256.)

On October 14, 2009, Price returned to Dr. Richards for a follow-up appointment. She complained of some auditory hallucinations. Specifically, she reported hearing noises at times, but also hearing people talking when no one is around. Dr. Richards noted that Price's sleep was better, her energy was okay, and her concentration was better. Dr. Richards continued to treat Price with medication. In a follow-up appointment in January 2010, Price reported poor sleep. Dr. Richards continued to treat her with medication. In March 2010, Price reported to Dr. Richards that her sleep was "good," and the medication was "helping her." At a follow-up appointment in April 2010, Price stated that she was not having any auditory hallucinations. She again reported that her sleep was "good." Dr. Richard continued to treat her with medication. In October 2010, Price continued to report that her sleep was good and the medication was helping her. In January 2011, Price complained that she was having some problems with sleeping, but by

9

March 2011, her sleep was better. Throughout this time period, Dr. Richards continued to treat Price with medication.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Price is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. § 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the

10

> impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC [(residual functional capacity)], age, education, and work experience, there [are] a significant number of other jobs in the national economy that [the claimant] could perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011) (quoting *Moore*, 572 F.3d at 523); 20 C.F.R. § 416.945.

The ALJ applied the first step of the analysis and determined that Price had not engaged in substantial gainful activity since July 6, 2009. At the second step, the ALJ concluded from the medical evidence that Price had the following severe impairments: ADHD, anti-social personality disorder, major depressive disorder, generalized anxiety disorder, and obesity. At the third step, the ALJ found that Price did not have an

11

impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Price's RFC as follows:

> [Price] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to tasks that can be learned in 30 days or less, with no more than simple, work-related decisions and few workplace changes; no more than occasional interaction with the public, coworkers, or supervisors; no requirement to read instructions or write reports; and no work at a production rate pace.

(Administrative Record at 12.) Also at the fourth step, the ALJ determined that Price had no past relevant work. At the fifth step, the ALJ determined that based on her age, education, previous work experience, and RFC, Price could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Price was not disabled.

### B. *Objection Raised By Claimant*

Price requests that the Court look at her doctor's reports and determine whether the reports were reviewed in her case. Specifically, in her brief, Price asserts:

> I . . . would like my doctor reports looked at for evidence in my case for SSI[.] I believe none of this stuff was reviewed in my case because I was on SSI before and all of this stuff was took in to [sic] consideration so in short I would like this done in my appeal.

Price's Brief (docket number 13) at 1.[8] In response, the Commissioner argues that the ALJ fully considered the medical evidence in the record and properly formulated Price's residual functional capacity in determining that she is not disabled.

---

[8] The Court notes that there is no evidence in the record that Price ever received any type of disability benefits, including SSI benefits.

12

Because Price offers only a generalized argument and no specificity with regard to the issues the Court should address, the Court will consider the following issues in reviewing the ALJ's decision: (1) Did the ALJ fully and fairly develop the record in this matter; and (2) is the ALJ's RFC determination supported by substantial evidence. Because these issues go together hand-in-hand, the Court will consider them together.

When an ALJ determines that a claimant is not disabled, he or she concludes that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998). The ALJ is responsible for assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)). While an ALJ must consider all of the relevant evidence when determining a claimant's RFC, "the RFC is ultimately a medical question that must find at least some support in the medical evidence of record." *Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007) (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

In considering the opinions of a treating physician, an ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch*

13

*v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id*. The regulations require an ALJ to give "good reasons" for giving weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The regulations also require an ALJ to give "good reasons" for rejecting statements provided by a treating physician. *Id*.; *see also Tilley v. Astrue*, 580 F.3d 675, 680 (8th Cir. 2009) ("The regulations require the ALJ to 'always give good reasons' for the weight afforded to the treating source's opinion.") (citation omitted).

Lastly, an ALJ has a duty to develop the record fully and fairly. *Cox*, 495 F.3d at 618; *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

The ALJ addressed Price's medical records as follows:

> [Price] first sought mental health treatment in July 1998 at ABBE Center for Mental Health (ABBE), but she apparently did not keep follow-up appointments, and they closed her file. Nine-months later, [she] returned, reporting anger outbursts, assaultive behavior, and that Ritalin had helped calm her in the past. At the conclusion of her appointment, [she] was diagnosed with ADHD. At her follow-up visit just a few

14

weeks later, [she] presented complaining of her irritability and how it contributed to her inability to get a job. . . .

[Price] was scheduled for another follow-up visit the next month, but there is no record of this appointment. In fact, [her] next record of receiving treatment is dated in July 2000, approximately 15 months later. At that visit, she reported having eventually received prescriptions from Dr. Richards and another physician, but also admitted she refused to take them. . . .

The next week she reported to ABBE again, however, and was able to see Dr. Richards, who diagnosed her with intermittent explosive disorder, and possible bipolar disorder. He also prescribed bipolar medication[.] . . . Over the course of the next five months, [Price] kept roughly monthly follow-up appointments with Dr. Richards while they adjusted her medication regimen. By January 2001, [Price] reported 'much less anger and less mood swings.' Dr. Richards also observed that she was cooperative, had good eye contact, and that she was able to express herself. [She] did report some sleep problems, but overall, she appeared to have made progress with regular treatment and adherence to medication.

Unfortunately, [Price] went another eight months before returning to ABBE, and presented with not only sleep problems, but also symptoms of anxiety. Dr. Richards adjusted her medication with instructions to return in six to eight weeks, but, again, [she] did not return as instructed. In fact, it was not until over three years later that she presented with complaints of anger and the need for ADHD medications. . . . She returned for her follow-up appointment the next month, but, just as before, she ceased treatment with ABBE for another extended period.

Apparently, [Price] was incarcerated during at least part of this gap in treatment, but records show she did not seek mental healthcare in jail until November 2006, approximately two

15

years later. Interestingly, those records show she had not been taking any prescriptions at that time. Once released, the record indicates that [Price] did not seek treatment until September 2009--almost three years later. . . . Again, she presented for ADHD medications and irritability. Over the course of the next year and a half, [she] attended follow-up appointments roughly every 3 months for renewals of her prescriptions. However, she did not engage in any outpatient therapy or other treatment to help address her symptoms.

As of her most recent treatment records, [Price] continues to have diagnoses for ADHD, a history of bipolar disorder, generalized anxiety disorder, and obsessive compulsive traits and anger episodes presumably associated with a personality disorder. Given these diagnoses were given by her treating psychiatrist, who is once again Dr. Richards, the undersigned is compelled to find them severe impairments. However, other factors suggest the symptoms associated with those impairments are no more limiting than already accounted for in the above-listed residual functional capacity assessment. . . .

Overall, [Price's] large gaps in treatment history, her obstinate attitude toward taking medications, and her noncompliance when she finally accepted her prescriptions seriously undermine her credibility. She even admitted in her function report that she often does not take her medications simply because she over sleeps. When this is considered with the facts that [Price] showed improvement in her conditions after she attended monthly medication reviews from July 2000 to January 2001, and that she has never entertained the notion of outpatient therapy sessions, it leaves the conclusion she would likely see improvement in her symptoms if she chose to make the effort. Nevertheless, the undersigned finds [Price] is limited to the restrictions contained in the above-listed residual functional capacity assessment, which accounts for her alleged mental impairments to the extent supported in the record.

(Administrative Record at 14-16.)

Having reviewed the entire record, the Court finds that the ALJ fully and fairly developed the record with regard to Price's medical records. *See Cox*, 495 F.3d at 618. The Court also finds that the ALJ properly considered and weighed both the opinion evidence provided by Price's treating sources and the medical evidence as a whole. Specifically, the ALJ explained her findings with regard to the medical evidence, and provided "good reasons" both explicitly and implicitly for the weight given to the medical evidence and the opinions of Price's doctors. *See* 20 C.F.R. § 416.927(d)(2); *Strongson*, 361 F.3d at 1070; *Edwards*, 314 F.3d at 967. Moreover, the record reflects that not only did the ALJ properly consider Price's medical records, but the ALJ also properly considered the observations of treating and non-treating physicians and Price's own description of her limitations in making the RFC assessment for Price.[9] *See Lacroix*, 465 F.3d at 887. Because the ALJ considered the medical evidence as a whole, the Court concludes that the ALJ made a proper RFC determination based on a fully and fairly developed record. *See id.* Even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

## *VI. CONCLUSION*

I find that the ALJ fully and fairly developed the record in this matter, and made a proper RFC assessment for Price. Accordingly, I believe the ALJ's decision is supported by substantial evidence and should be affirmed.

---

[9] *See* Administrative Record at 12-16 (providing thorough discussion of the relevant evidence for making a proper RFC determination).

## VII. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that the district court **AFFIRM** the final decision of the Commissioner of Social Security and **DISMISS** with prejudice Plaintiff's Complaint (docket number 3) filed on September 18, 2012.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court.

DATED this 14th day of August, 2013.

_____
JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA